The next case set for argument is Parkview Lounge v. National Labor Relations Board. Good morning. Good morning. May it please the Court, my name is Ariadne Panagopoulou. I represent the petitioner Parkview Lounge, and I'm here to challenge the NLRB's decision order that Parkview Lounge engaged in an unfair labor practice by terminating former employee Suzanne Davis. In the NLRB's decision, the NLRB only looked at one factor to arrive at its determination, the temporal proximity between a staff meeting that happened in January 27th of 2016 and her subsequent termination that occurred two days later. And I agree that in certain instances, temporal proximity between a protected activity and termination can be circumstantial evidence that goes to the employer's motive behind the termination. Whether you agree or we agree, the Board has permitted a deference in this regard, right? It's a question of substantial evidence. Was there substantial evidence on which they could have reached their decision? I have two responses to this question, Your Honor. First, this is not purely a question of fact. This is a mixed question of law and fact. The question of law is whether the January 28th email that was sent by Suzanne Davis to her manager Jeffrey Daley functioned as what we call a legitimate intervening event. I've cited case law in my brief to that effect. And that's something that the NLRB did not address at all in their papers, and that's an error of law. So that's my first response. My second response is even if we say, yes, it's a purely factual issue, the standard of review is substantial evidence of the record as a whole. So in other words, what the NLRB must do is look at the record as the NLRB reviewed it, also look at the record and look at the evidence that the NLRB failed to consider. And the NLRB here completely failed to consider the January 28th email sent from Suzanne Davis to Jeffrey Daley documenting all the reasons that made the brine-packing owner to make the ultimate decision to fire Ms. Davis. And that's — that email is in Joint Appendix page 455. It's a one-page email, and it's something that I encourage Your Honors to take a look   Roberts. I'm sorry. Am I mistaken that at page 7 of the decision that the — and I think this would have been the — I guess it's the ALJ's decision, that there was a reference to that, to that email? Yes. And the administrative law judge certainly referenced that email. And what's interesting is that he even said that it was this email that broke the camel's back and it was this email that made Brian Packin take the ultimate decision to terminate former employee Davis. The NLRB didn't reference that particular quote by the administrative law judge, and it's indeed peculiar, because in their complaint, the NLRB doesn't contend that that email constituted protected concerted activity. Yet the ALJ said that this was the email that broke the camel's back and led to Davis's termination. We have to accept the finding that Packin knew about the meeting at which Davis spoke about the working conditions, right? I would respectfully say no. What we do accept is because we have a recording that was produced by Davis, we do accept the facts and we do accept the NLRB's contention that Davis engaged in protected concerted activity at that meeting. We do dispute that Mr. Parkin was aware of the fact that she — The ALJ, having assessed the credibility of the parties before the ALJ, concluded that Packin was aware of that, right? That's not a credibility determination. Packin was aware that a staff meeting occurred, and Packin was aware that Davis said something about health benefits. There's nothing in the record to establish that those comments were made in the plural form, in other words, that Davis was speaking on behalf of other employees using words like we and our. And there was nothing in the record to the effect that Packin knew that other employees nodded in approval of Ms. Davis's comments. And again, the standard of review here is substantial evidence on the record as a whole, and the record simply doesn't establish that. If — Isn't that a lot? They said they were going to report to Packin. One of them did. I think it was Daly, said he was going to report to Packin what occurred at the meeting. And he reported generally. I mean, in that— Well, you don't know that. I mean, isn't that something that the — that is — can be a matter of inference? I mean, you know, why couldn't the Board draw the inference that everything about that meeting was disclosed? Because, as I cited— Tell me something that cuts the other way apart from that inference, which doesn't seem to be an unreasonable one to me. I have cited a case law in my paper that says that just because an agent is aware of protected concerted activity, that isn't imputed necessarily on the decision maker that makes the decision to terminate. But we go beyond that here, right? This is not just imputation. This is actually evidence that he said he was going to speak to him, to Packin. He spoke generally— And he spoke to Packin. He spoke to Packin about the fact that Davis had brought up certain issues on behalf of herself concerning health benefits. She was— You're saying that there's evidence that it was limited to that? Exactly. And— What's the evidence that it was limited to that? Daly's own testimony from — Daly took the stand and said that from his perspective, Davis was bringing issues that only concerned her. Her health benefits was something that only concerned her and not other employees, and that's what he communicated to Brian Packin. But wasn't the ALJ in a position to either credit or discredit that self-serving statement? He didn't discredit that particular statement. And the NLRB ultimately has— Well, he must have, because he came to a different finding. He came to a finding that Suzanne Davis engaged in protective concerted activity, and by the mere fact that one manager was there, Mr. Daly, and by the mere fact that Daly did communicate generally what had transpired in that meeting to Brian Packin when the ALJ came to the determination that Brian Packin must have known. But that doesn't establish the NLRB's burden of proof, which is to show that Brian Packin knew the nature of Davis's activity as concerted. Let me ask you, if we disagree with you, and we find, since it's a fairly low standard, that there is substantial evidence to support the board's merits decision, how can we possibly say that the remedy imposed is unlawful, that she isn't entitled to reinstatement? Wouldn't that require us to reject the initial substantial evidence finding and finding that, in fact, she was discharged for cause? Yes. Your Honor, I want to — I will answer your question, but I also want to just correct something for the record, if I may. So Section 10C of the NLRB is what gives the NLRB power to order reinstatement and back pay. And then — so 10C says that if there's a determination that the employer engaged in an unfair labor practice, the board may take such affirmative action, including reinstatement of employees with or without back pay. So the inference to that is that when an unfair labor practice isn't committed, then the board doesn't have that power. But then there's further language in there. There's an exception, and the exception says, no order of the board shall require the individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. That's precisely what I'm asking about, because if we find substantial evidence supports the finding that she was discharged primarily as a result of her concerted activity, how could we possibly find that she was actually discharged for cause at the same time? So the standard for the NLRB to show — so the NLRB prevails if they show that the protected concerted activity was a substantial or motivating factor leading to the discharge. It doesn't have to be the sole factor. And the NLRB didn't, in fact, establish in its decision that it was the sole factor. So if — if this Court here today was to agree with the NLRB and say, yes, the — the protected activity was a motivating factor, but we do agree, actually, that the main factor was the fact that she was insubordinate, then back pay and reinstatement is inappropriate. All right. We'll hear from the board. Thank you very much. I just have one more — You have three minutes for rebuttal. Okay. Thank you, Your Honor. Good morning, Your Honor. Excuse me. May it please the Court. My name is Meelakshmi Rajapaksa. I'm counsel for the National Labor Relations Board. It is admitted in the record Brian Packin, who's the CEO of Parkview Lounge, admitted that he had no agenda or plan as of January 22nd, 2016, to discharge Ms. Davis. So the question that the board confronted, and I think that the Court has to consider in this case, is what happened in the seven days between January 22nd and January 29th that caused this employer to suddenly discharge this employee when it had no plan to do so with full knowledge of her foibles, of her little disagreements with managers and so on. And the board's answer to the question, of course, is that what changed and what was different in that seven-day period is Ms. Davis spoke up at a staff meeting with managers present and new employees, and she raised a number of workplace concerns that employees had been discussing over time amongst themselves. She talked about the cold temperatures in their work areas. She talked about uniforms. She talked about health benefits. Contrary to what my colleague has said, Brian Packin, the CEO of Parkview, was not present at that meeting, but the evidence abundantly supports the board's finding that he knew what transpired, and specifically... This is all by inference, right? I mean, there's no direct evidence that he knew, is there? Well, the inference is a relatively small one. There's an admission by Mr. Daly, on which the board relied, that in the context of telling Mr. Packin what happened at the meeting and what specific concerns employees raised, he specifically mentioned Ms. Davis to Mr. Packin, and he told Mr. Packin, and this is a Daly's testimony, that Ms. Davis had asked about health benefits and that he answered, he provided an answer to the entire staff on that issue. Implicitly, he was treating at least that concern as a group concern. And then elsewhere in his testimony, and these admissions are at page 199-200 of the joint appendix and 203-204. In general, the relevant transcript citations on this knowledge issue are at page 26 of the board's brief. In any event, so the board inferred, based on Mr. Daly's admission and also Mr. Packin's admission, that he was told that Ms. Davis spoke up about health benefits in particular. It isn't much of an inferential step for the board to say he knew what happened at the meeting and he specifically knew that Ms. Davis had raised concerns of interest to the employees as a group. And the idea that counsel has raised that perhaps Mr. Daly simply said she raised her own concerns about health benefits is at odds with the record in the sense that it would be strange for a manager to mislead another manager, the CEO, into thinking that something was an individual concern when we know and Mr. Daly knew from his own observations at the meeting that when Ms. Davis spoke up, her comments were met by nods from other employees and she didn't advocate for health benefits for herself. She asked if the employees could get health benefits. So there's no question, and I don't think Parkview is contesting, that she was engaged in protected activity and the board reasonably found that Mr. Packin knew of, excuse me, of the activity. So what are we to make of the tone of the e-mail the following day and the fact that there seems to be documented evidence of her repeated confrontations with management? I mean, you referred to her foibles, but I don't think you would be suggesting that management has to, having tolerated them for some weeks, must continue to tolerate them indefinitely once she speaks up at a staff meeting. Right. I think that January 28th e-mail, first of all, the board did address it at footnote three of its decision and the board found that that January 28th e-mail was a pretextual basis for the discharge and not the actual basis. And so Parkview is incorrect that the board didn't address the e-mail. But to answer your question, Judge Carney, this employer, we take employers as we find them. This employer had tolerated Ms. Davis' behavior and on January 22nd, that's the relevant backdrop for this January 20th e-mail, Parkview's CEO had told Davis, look, we accept that you have a strong, quote-unquote, strong personality. We're willing to work with that. And he encouraged her to continue coming to them and speak up if she feels that something is unfair or not right. I would submit that the January 28th e-mail was not out of the ordinary at all for her. She strongly and fairly aggressively presented her reasons why she thought she was being treated unfairly. There's nothing unusual about that and she was encouraged to do that by this employer. So based on all the evidence, the board looked at not only the timing, which is in itself very striking and suspicious, but Parkview repeatedly sort of refuses to confront the fact that there are several other aspects of the board's finding that animus motivated Parkview's actions. There is not only the timing, there's also the fact that the reasons shifted, the reasons for this discharge. Mr. Packin presented one reason at the time to Ms. Davis and then when the State of New York asked Parkview to report the specific reasons that were given to Ms. Davis, Parkview inexplicably produced two additional reasons, that her service was poor and she had poor relationships. Wasn't there a reference to performance issues, which seemed to me vague enough to potentially encompass the confrontational tone that she took with management? That's true, Your Honor, but I think what the board is concerned about is that there were added reasons. All of a sudden, it wasn't just the reason presented to Ms. Davis at the time. And again, the form on which these things were reported specifically asked Parkview to report what was said to her. So they embellished and that suggests that all of the reasons they gave were not the true reasons. There's also the fact that these reasons, these so-called reasons are inconsistent with the statements and conduct of Parkview at that January 22nd meeting. There was no suggestion of any performance issue that was going to possibly precipitate her discharge in the coming weeks or days. There was no suggestion that she was in danger of being discharged for her relationships with managers, which were all known. All of those issues were known at that time. And so the idea that all of a sudden, these things became a grave issue and warranted her immediate discharge on January 29th is simply implausible. Let me ask you the remedial question. If we were to agree with you that substantial evidence supports the board's decision that this was an unfair labor practice and that she was discharged at least primarily or substantially for her concerted activity, are there circumstances in which reinstatement would nonetheless be barred under 10C because there was actually conflict or some danger even associated with her activities? Yes, yes, that is the function of Section 10C is to give the employer an opportunity, if there is evidence independent of any unfair labor practice, of some sort of misconduct that would warrant the discharge of any employee. Section 10C... So the employer would have to show by a preponderance that or that there was a substantial motivation in performance issues, even though at the same time the board would be concerned about the fact that she was discharged. Are you saying that substantial evidence supports our determination that a motivating factor... I mean, help me with this. Right. Let me first say a discredited cause, which is what you have in this case, cannot be for cause or purposes of Section 10C. That's sort of the simple answer. But yes, in an appropriate case, the board can find that notwithstanding the unfair labor practice, the employer has some independent reason why the employee is unfit for further service. And so, for example, in Terracor and Anheuser-Busch, which are cases cited in the board's brief, those cases involved an unfair, unlawful investigations or unlawful surveillance. But even though those acts of surveillance and investigation were unlawful, the underlying misconduct stood independent of any unfair labor practice. And so there was no remedy of reinstatement and back pay in those cases because there was independent misconduct. In this case, you don't have any independent misconduct. What you have is Parkview's effort to resuscitate its failed reasons for the discharge and to present discredited causes or, excuse me, just one discredited cause. There could be mixed motives, but the unlawful animus dominated. And that, is that right? That's right, that's right. No, I mean, under right line, the board simply has to find that animus was a motivating factor and the board... It isn't a response to that, that notwithstanding the animus as a motivating factor, the board is free to say that we would have done it anyway. Because, apart from whatever the motives were of this, because of the conduct of the employee. So that's the defense that could be raised, right? That is the defense, but in order for an employer to escape liability, essentially, it has to show that it would have done the same thing regardless. That's what I'm saying. Exactly. And so in this case, by definition, because the board found a violation, Parkview failed to make out any credible defense. And so the idea that section 10... Are you saying that defense is rejected by virtue of the board's finding? Right, exactly. If Parkview, and just to extend things a little further, if Parkview had some independent reason for saying she was unfit, for example, if it was later discovered that she had stolen from the company, then there might be a role for section 10C if Parkview could also show that it would have summarily discharged anyone for that offense. But you don't have anything approaching... Assuming that she is the same person and conducts herself in the same way, and maybe has renewed difficulties with management now that she's reinstated, and maybe is bitter about having to be involved in this whole lawsuit? She doesn't have immunity. No, no, I'm saying... So she doesn't have immunity, but I'm wondering about, sometimes reinstatement isn't the best answer, because the feelings are going to be so bitter that it's just counterproductive. And I just wonder why that wouldn't be the case here. Reinstatement is the board's standard remedy for this kind of unfair labor practice. And Parkview, of course, when she is reinstated, is free to take action if it has a lawful reason for doing so. The import of the board's decision is simply, Parkview can't take action against an employee for engaging in protected concerted activity. If she's reinstated and she has renewed problems of the same kind, and they can show that they would discharge anyone for that kind of conduct, they're free to do so. Presumably after warnings, et cetera. Yes, yes. And that's also critical in this case, Your Honor, that there were no warning flags. Thank you very much. I think we have the argument. Ms. Panagopoulou, you have three minutes. So we talked earlier about whether or not Brian Packin had knowledge of Mrs. Davis' engagement in protected activity. That's one factor that the NLRB has to prove under right line. But the inquiry doesn't stop there, and the inquiry continues. And it's the NLRB's burden to prove that the employee's engagement in concerted protected activity was a motivating or substantial factor leading to her termination. And I want to focus that on this now. And I want to rebut some of the arguments made by my colleague, but I also want to focus on certain issues that she very glaringly did not bring up. So our contention is that the main reason Ms. Davis was terminated was insubordination, her inability to work with management. And she has not stood up here and said that this is false. She has not made that argument, and she's not making this argument in her papers. She was making the argument that the January 27th meeting, 22nd meeting, which resolved the dispute with the co-worker, resulted in sort of a handshake and everything was going to go forward and they were going to work together. So she's saying that basically the last week is when everything fell apart. And then she's asked us to look at what happened in that week. And, of course, the major event of that week was the January 27th meeting with the co-workers in which she raised these various issues. I respectfully disagree, Your Honor. The January 22nd meeting had a very specific purpose. The purpose was to, quote, unquote, rehabilitate Suzanne Davis. And if you look at the record at page 400. It wasn't what it was limited to, the actual meeting itself. The discussions went beyond that. It went beyond. It went beyond that because owner Brian Packing allowed it to go beyond that. But the whole purpose of that meeting was. He wasn't at the meeting. He was in that meeting, in the January 22nd meeting. We were talking about the 27th meeting. I'm talking about the January 22nd meeting. And the purpose of that meeting was to tell Davis. If you want to work here, you have to improve your relationship with management. You have to be able to accept constructive criticism. Because we've noticed. Didn't the meeting actually end with an apology to Davis? And an agreement to continue working together in a friendly and cooperative way? The apology was from a manager, Natalia Accentieva. It was not from Brian Packing. And that's unrelated. But it was her complaint that was the motivating factor for that meeting, right? So the issue that we are considering here for the purposes of this appeal is not who was right or who was wrong. It's not whether Manager Accentieva was right or Suzanne Davis was right. The question that we have to answer is what went through Brian Packing's mind when he made the decision to discharge Davis. So from Brian Packing's perspective, there's a meeting on January 22nd. He tells her, if you want to continue working here, you have to get along with management. Five days later, on January 27th, in a separate meeting between Suzanne Davis and Jeffrey Daly, Jeffrey Daly criticizes performance issues that had arisen. Suzanne Davis had walked off and a table had not paid the bill. And later, in January 28th, the day before her termination, Suzanne Davis sends an email to Jeffrey Daly saying, you know what, I'm not responsible for the performance issues. I acknowledge that I spoke poorly to Jonathan Torres, my other manager, but it's my right to basically speak poorly to them. And he accused Jeffrey Daly of holding a, quote, unquote, vendetta against her. So it was that email that signaled to Brian Packing that this employee could not work with management. It was that email that, as the ALJ noted, was the straw that broke the camel's back. Okay. I think we have the arguments and we have your papers. We'll review them carefully. I just. You're out of time, I'm afraid. Okay. Thank you very much. Thank you for your arguments. We'll take the matter under advisement.